### UNITED STATES of America, Plaintiff,

v.

### William C. GILMORE, et al., Defendants.

### No. 3:95 CV 2125 (GLG).

United States District Court, D. Connecticut.

July 19, 1999.

Christine L. Sciarrino, U.S. Attorney's Office, New Haven, CT, Deirdre Anne Martini, U.S. Attorney's Office, Bridgeport, CT, for U.S., Plaintiff.

William C. Gilmore, West Woodstock, CT, pro se.

Richard R. Phaneuf, Woodstock, CT, pro se.

Frank Steven Marcucci, Solomon, Krupnikoff & Wyskiel, Meriden, CT, Lawrence S. Hillman, Hamden, CT, for Alan Solomon, Defendant.

Bruce A. Zawodniak, Eisenberg, Anderson, Michalik & Lynch, New Britain, CT, for Southern New England Telephone, Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

GOETTEL, District Judge.

William C. Gilmore and his wife, Cheryl A. Gilmore, are farmers. In 1973, they obtained four loans from the Farmer's Home Administration ("FmHA"),[2] United States Department of Agriculture. The

---

1. These Findings of Fact and Conclusions of Law are rendered by this Court after a two-day trial on the government's foreclosure action after remand from the Second Circuit. *See United States v. Gilmore,* 172 F.3d 39, 1999 WL 55255 (2d Cir. Feb. 3, 1999) (Unpublished Opinion).

2. In 1994, the FmHA was combined with certain other Department of Agriculture agencies to form the Farm Service Agency ("FSA"). Thus, at times in this opinion, we refer to the FSA instead of the FmHA.

government now seeks to foreclose a mortgage on the Gilmores' farm because of defaults on two of the loans. Most of the facts are not in dispute.

Three of the loans were obtained by the Gilmores in May 1973. One in the amount of $20,000 was secured by a mortgage on the farm, (sometimes referred to as the "farm loan" or the "01 loan"), and another in the amount of $5,000 was secured by a mortgage on the farmhouse (also referred to as the "farmhouse loan" or the "02 loan"). A small operating loan in the amount of $2,000 was taken out that month, and a few months later a second operating loan in the amount of $1,400 was obtained.[3] For all of the loans the Gilmores gave the FmHA promissory notes. Only the farm loan and farmhouse loan were secured by a real estate mortgage on the Gilmores' farm.

All of the loans were amortized loans calling for monthly payments of principal and interest.[4] The Gilmores made some payments during the first year after taking out the loans. They then made no payments of any consequence for the next fifteen years. (When the loans were in default and accelerated, the Gilmores tendered small amounts but these were returned by the government). The Gilmores also ceased paying their real property taxes and the insurance on their farm properties.[5] Pursuant to the terms of the real estate mortgage and the regulations, the government had the right to pay unpaid real property taxes when not paid by the Gilmores and did so in substantial amounts: in 1979, $3,889;[6] in 1981, $964; and in 1987, $7,933.

The mortgage on the farm provided that the entire indebtedness, secured by the mortgage and evidenced by the notes for the farm loan and the farmhouse loan, may be declared immediately due and payable should a default occur in the performance of any obligation of the debtors under the notes and mortgage. It also provided that the Gilmores agreed to pay or reimburse the FmHA for expenses it incurred that were "reasonably necessary or incidental to the protection of the lien and the priority" of the mortgage and "to the enforcement of or the compliance with the provisions [of the note and mortgage] . . ., including but not limited to costs of evidence of title to and survey of the property . . . ." It further provided for advances by the government, which would bear interest at the note rate.

By the early 1980's, substantial interest[7] and other charges had accrued, and the government accelerated the loans as being in default. In 1983, the government commenced foreclosure proceedings. Proceedings were delayed for a number of years because of a nationwide injunction against foreclosure of FmHA farmer program loans. By 1989 the government was able to continue the proceedings. The Gilmores retained an attorney, and in May of

---

3. The two smaller loans have long since matured (they were six-year and three-year loans) and by virtue of a payment made in 1989 are viewed as having been paid off. Evidence was received concerning various payments and their apportionment. To the extent that payments were attributed to the small operating loans first (which were not secured by the real estate), we find that this was in accordance with the regulations, see 7 C.F.R. § 1951.9, and to an extent worked in the Gilmores' favor, since the interest rates on the operating loans were slightly higher than the interest rate on the farm loan. Because we find that these loans were paid off in 1989, we give no further consideration to the operating loans as such.

4. Although the notes themselves called for annual payments of principal and interest, the Gilmores entered into a supplementary payment agreement calling for monthly payments.

5. For the first several years, the government paid premiums on the fire and property insurance, charging those amounts to the Gilmores, but in 1977 ceased this practice.

6. All figures are rounded to the nearest dollar.

7. The interest rate on the farm loan was 5% per annum, and on the farmhouse loan the interest rate was 7 1/4%.

1989, they reached a settlement with the government concerning the sixteen years of unpaid principal, interest, taxes, charges, etc., that had accrued. The government advised the Gilmores that if they paid $42,124 it would bring their account "current." While there was a slight delay in the Gilmores' making the payment, resulting in a slightly higher amount being paid, payment was ultimately delivered to the government and the United States Attorney's Office discontinued the mortgage foreclosure suit.

The Gilmores claim that they understood that with this payment they had cleared up all delinquencies and in the future would be responsible only for their annual amortized payments of $1,166 on the $20,000 farm loan and $403 on the $5,000 farmhouse loan. That, however, was not the FmHA's view of the situation. To the government, "current" meant that enough money had been paid that the foreclosure proceedings would be withdrawn, but, in the government's view, all of the principal was still owing ($25,000), as well as substantial interest. That issue was the major factual dispute in the trial of this case.

The government's bookkeeping records and other documents support its position, indicating that, on the farm loan, additional payments of $3,816.51 in principal and $3,129.86 in interest for a total of $6,946.37, and $1,064.59 in principal and $2,641.27 in interest for a total of $3,705.86 on the farmhouse loan, would have been required to truly bring the Gilmores' account completely current based upon the amortization schedule. We cannot, however, overlook the fact that these loans were the subject of ongoing litigation. Cases can be settled for less, indeed far less, than a plaintiff is owed. Although the Court advised the government that it

should produce witnesses from the United States Attorney's Office concerning the terms of the settlement, it produced no witnesses and stated that the two assistants involved in the case could not remember the details and there were no documents memorializing the terms of the settlement except the agencies' records concerning payments due and not made. There is no doubt, however, that some documents as well as oral discussions described the lump-sum settlement payment as bringing the Gilmores "current." It was quite reasonable for the Gilmores to assume that all they would owe were the future annual payments on the two notes and, in the absence of any contrary evidence, we so find.[8]

After the 1989 settlement, the Gilmores made payments (some partial) for a couple of years.[9] In 1991 they made only partial payments, and in 1992 they made no payments. In 1993 they made payments on both notes including $500 extra on the farm loan. Except for a small payment in 1994, they made no further payments on either loan. In 1995, the Farm Service Agency ("FSA") declared the entire indebtedness immediately due and payable as of March 10 of that year. In late 1995, the government commenced the instant foreclosure action. During the years between 1987 and 1996 substantial real property taxes had accrued on which the Town of Woodstock, where the farm is located, was charging substantial interest. Consequently, in October, 1996, the government paid $21,170 to the Town of Woodstock for the accrued, delinquent taxes, plus interest.

The government takes the position that the Gilmores now owe $66,210 on the two loans. In light of our conclusion that the

---

**8.** The $20,000 farm loan was a forty-year loan so that in 1989 it still had twenty-four years to run. The farmhouse loan was a thirty-three year loan which still had seventeen years to run. The farm loan does not mature until

2013 and the farmhouse loan matures in 2006.

**9.** The following year was charged against the settlement figure.

1989 settlement of the previous foreclosure action eliminated any past deficiency, we find that the amount due to the FSA at the present time is $48,736.04. This sum is computed as follows:

### AMORTIZED PRINCIPAL AND INTEREST PAYMENTS FOR NINE YEARS FROM MID 1990 – MID 1999

|  | 01 LOAN (FARM) | 02 LOAN (FARMHOUSE) |
|---|---|---|
| Principal and Interest Payments for 9 years: | $10,494.00 | $3,627.00 |
| Amounts paid: | ($ 2,588.50) | ($ 403.00) |
| Deficiency to date: | $ 7,905.50 | $3,224.00 |
| Remaining principal balance on the loan: | $11,695.39 | $2,105.70 |
| Taxes paid: | $21,170.45 | 0.00 |
| Other charges: [10] | $ 2,635.00 | 0.00 |
| TOTAL: | $43,406.34 | $5,329.70 |
| GRAND TOTAL: [11] | $48,736.04 | |

Mr. Gilmore maintains that the reason he stopped making his mortgage payments was because he questioned how the 1989 settlement payment had been applied. We do not accept that excuse. Prior to 1989, he had essentially made no payments for some years. Following the settlement he did pay some amounts for a couple of years. Even if he had grounds to be dissatisfied with the FmHA's explanation as to the status of his accounts, including the 1989 payment, that does not legally justify his complete failure to make payments for the next seven or eight years. At a minimum, he knew that he owed the annual payments on the two loans.

We find, therefore, that the Gilmores are in default on the two loans secured by the mortgage on the farm property, and that the government is entitled to foreclose on the subject property.

A remaining question is whether this Court can grant judgment in favor of the government in light of the decision of the Court of Appeals rendered on February 3, 1999. *United States v. Gilmore*, 172 F.3d 39, 1999 WL 55255 (2d Cir. Feb. 3, 1999) (Unpublished Opinion). This Court had granted the government summary judgment on much the same evidence as presented at trial, determining that the mortgages were in default and could be foreclosed unless the defendants paid $34,920.[12] The Second Circuit, considering the matter de novo in the light most favorable to the defendants reversed, concluding that there remained a genuine issue of material fact as to whether the Gilmores had defaulted on the loans. One issue on which they focused was the matter of the allocation of the 1989 lump sum payment. Since we have determined that issue in the defendants' favor, we move on to other issues raised by the appellate decision.

The Court of Appeals found that the records and statements produced did not reconcile with each other and that many

**10.** These include appraisals and title searches with respect to the foreclosure action.

**11.** This figure is substantially higher than the amount awarded on the motion for summary judgment. However, that figure included only what was necessary to bring the Gilmores current to the year of that decision.

Besides additional interest the 1999 figure includes paying off the remaining balances, but does not include default interest for the years since the settlement.

**12.** *See* Note 11, *supra*.

charges were not accurately detailed.[13] In the trial of this case the government offered 142 exhibits detailing the various charges and amounts assessed. We find that these documents, and in particular exhibit 140, accurately reflect the payments due, the charges made, the various advances charged, and the payments made.[14]

The Court of Appeals also stated that the government must provide some justification for "advances" and "charges" which accrued on the loans. The government's use of the term "advances" is at times misplaced. It developed at trial that these loans, like many other made by the FmHA, were resold to a commercial lender. When the Gilmores stopped making their payments, the government was compelled to pay the interest to the insured lender which held the loans. When it did so, it transferred the accounting of the money from unpaid interest to principal. The important consequence of this transfer was that interest could accrue on the payments that they had "advanced" to the insured lender. There were other charges listed as "advances," such as the insurance payments mentioned earlier and a couple of appraisals of the property and title searches made in the two foreclosure actions. Although sometimes misstyled, all of the charges were warranted, including the application of interest on the principal, which included interest paid by the government to the insured lender. The mortgage agreement, the Rural Developers Insurance Fund, 7 U.S.C. § 1929a, and the Code of Federal Regulations provide that the Agency is authorized to assess default charges and advances and that payments made by the borrower were to be applied to these sums prior to being used as payment of interest on the notes.

Most pertinent, however, were substantial payments made by the government for local real property taxes over the years (almost $34,000). The appellate court directed us to consider the Gilmores' argument that the government was not authorized to pay the taxes because the taxes did not constitute a lien upon the real estate which would be prior to the mortgages securing the FmHA's loans. The Court did note that 7 U.S.C. § 1985 authorized the Agriculture Secretary to make advances to protect the security for the lien or priority of the lien securing the loan and that, under 7 C.F.R. § 1925.2, taxes include real property assessments which can become a lien on the real estate. The opinion also noted that under 7 C.F.R. § 1925.4(b), if the borrower is unwilling or unable to pay the taxes, the Department of Agriculture might pay these delinquent taxes.

The question of whether tax liens filed after the mortgage security is perfected could take priority over the government's lien was not briefed by either side in any depth. Section 1984 of title 7, cited by the government, simply provides that property subject to a lien held by the United States "shall be subject to taxation by the State . . . and local political subdivisions in the same manner and to the same extent as other property is taxed. . . ." The regulations provide that it is the borrower's responsibility to pay the principal and interest on a timely basis, pay real estate taxes, provide adequate insurance, and comply with all other loan requirements. 7 C.F.R. § 1965.3.

Section 1965.11(b) of the regulations provides that, when necessary to protect the interest of the government, actions may be taken, including the payment of real estate taxes. Any advances made for

---

**13.** It may be that the government did not make all of the records provided at the hearing on the summary judgment motion a part of the record on appeal. The government did not argue the appeal.

**14.** A review of the records did reveal one overcharge of $25, which was deducted.

the purposes specified will be considered "protective advances." Loans may be reamortized without regard to loan limits to include protective advances when authorized on an individual case basis by the State Director. Thus, the regulations clearly give the government the authority to pay real estate taxes if necessary to protect the interest of the government. Mr. Gilmore, however, seems to argue that this was not necessary.

In *United States v. General Douglas MacArthur Senior Village, Inc.,* 470 F.2d 675 (2d Cir.1972), *cert. denied,* 412 U.S. 922, 93 S.Ct. 2732, 37 L.Ed.2d 149 (1973), the Second Circuit held that a federal mortgage lien held by the Secretary of Housing and Urban Development took priority over a local real property tax lien arising after the federal mortgage lien was recorded. The Court concluded, "[i]n short, the land is not immune from local taxation, but the federal interest is, and the local governments cannot enforce their liens until the federal debt is satisfied." *Id.* at 680.

Subsequently, the Supreme Court decided *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 740, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1978), which held that the relative priority of private liens and contractual liens arising from government lending programs, including specifically FmHA loans (although the security interest in question was on crops and farm equipment, not realty), was to be determined under nondiscriminatory state laws. *See Donovan v. Farmers Home Administration,* 19 F.3d 1267 (8th Cir.1994) (applying South Dakota state law to determine the rights of the FmHA, a junior lienholder); *Federal Land Bank of Wichita v. Ferguson,* 896 F.2d 1244 (10th Cir.1990) (holding that Colorado lien priority law placed the FmHA in a junior position as to a senior mortgage lienholder's claim for attorney's fees and rejecting federal first-in-time/choateness rule); *United States v.*

*Anthony,* No. 84 CIV 7119(PKL), 1986 WL 10278 (S.D.N.Y. Sept.4, 1986) (holding that the priority of liens arising from an FmHA lending program is determined with reference to state law rules); *Anderson v. Peterson's North Branch Mill, Inc.,* 503 N.W.2d 517 (Minn.App.1993) (determining the rights of the FmHA under Minnesota state law to a surplus upon foreclosing its mortgage); *In re Earl,* 147 B.R. 60 (Bankr.N.D.N.Y.1992) (holding that questions concerning the relative priority of private liens and consensual federal liens arising under FmHA administered loan programs are to be determined according to state lien priority law).

Connecticut General Statutes Annotated § 12–172 governs "tax liens, precedence and enforcement" and provides:

> The interest of each person in each item of real estate ... shall be subject to a lien for that part of his taxes laid upon the valuation of such interest.... Such lien ... *shall take precedence of all transfers and encumbrances in any manner affecting such interest in such item,* or any part of it. *Such lien, during its existence, may be enforced by levy and sale of such real estate* if such person has complete title thereto or of his interest in such real estate if he does not have complete title thereto. No sale of real estate for taxes or foreclosure of any lien shall divest the estate sold of any existing lien for other taxes.

Section 12–157, Connecticut General Statutes Annotated, then sets forth the method of selling real estate for taxes. It provides that, after the tax collector levies a tax warrant on the property, and after appropriate notice (including notice to the taxpayer and to each mortgagee, lienholder, and other record encumbrancer whose interest in such property will be affected by the sale), the tax collector may sell the property at public auction to a bidder who pays enough to cover the delinquent taxes, with interest, fees and other charges al-

lowed by law, or may sell the property to the municipality if there is no bidder or the amount is insufficient to pay the amount due. C.G.S.A. §§ 12–157(a), (c). The taxpayer and all mortgagees, lienholders, and other encumbrancers are then given notice of the sale and their rights of redemption. C.G.S.A. § 12–157(f). If redemption does not take place by the date stated in the notice (within six months) and in the manner provided by law, their respective titles, mortgages, liens, and other encumbrances shall be extinguished. *Id.* To redeem the property after a tax sale, the taxpayer or any person interested in the estate, must pay to the purchaser the amount paid by him plus interest at the rate of eighteen percent per annum. *Id.* If the purchase money and interest are not paid, the tax deed will be recorded after one year and have full effect, thus extinguishing the liens of the mortgagees. *Id.*

In *United States v. Marion County, Florida,* 826 F.Supp. 1400 (M.D.Fla.1993), the court discussed the issue of the priority of a Veterans Affairs ("VA") lien (which the court specifically noted was analogous to the FmHA lending program) and state and local tax liens. Citing *United States v. Kimbell, supra,* the court held that this had to be determined by state law, under which a tax lien was superior to all other liens. Under Florida law, the procurement of a valid tax deed extinguishes former record title and creates in the purchaser a new, independent and paramount title, as well as entitlement to immediate possession. Thus, the issuance of the tax deed extinguished the VA's pre-existing lien. The court rejected the VA's argument that, because its loan is considered by federal statutes, 38 U.S.C. § 3703(d)(3), to be a first lien, the state's conflicting priority scheme was prohibited by the Supremacy Clause. The court noted that properties acquired under the VA's lending program remain subject to the state and political subdivision's power to tax. 38

U.S.C. § 3720(a)(6). In light of this directive, the court determined that the VA's lending program did not operate so as to preempt established nondiscriminatory state law.

Also instructive is *United States v. Peckham,* 72 F.3d 672 (8th Cir.1995), in which the government had filed a foreclosure action on several FmHA loans. After a judgment of foreclosure was entered, the property sold for more that the value of the encumbrances against it. The debtor filed a motion to compel the government to pay him the "overplus." The government refused, stating that the debtor was entitled to a lesser amount because the government had advanced delinquent real estate taxes the day before the foreclosure judgment was entered. The court applied the local law of Iowa to determine the effect of a foreclosure judgment on a mortgage held by the United States and held that it was proper for the government to have paid the real estate taxes as a cost of sale and that it was entitled to reimbursement for these taxes.

■ Contrary to the position taken by the Gilmores, under Connecticut law, the Town's lien for delinquent real estate taxes would have priority over the government's prior recorded mortgage on the property. *See Wilcox v. Bliss,* 116 Conn. 329, 334, 164 A. 659 (1933) (holding that real estate taxes were a lien on the premises and "as a matter of law they constituted at least an inchoate lien and an actual encumbrance superior in order of priority even to the first mortgage"); *Northern States Financial, LLC v. Sorensen,* No. CV 940316682S, 1997 WL 408557 (Conn.Super. July 11, 1997) (holding that a defendant's prior mortgage did not encumber title of a grantee under a subsequent, valid tax deed); *see also Fidelity Trust Co. v. Irick,* 206 Conn. 484, 538 A.2d 1027 (1988) (showing the City's tax lien as a first priority over the first mortgage, which was given a second priority, with respect to the distri-

bution of the proceeds from a foreclosure sale). The law of Connecticut is clear that, had the government not paid the delinquent taxes on the Gilmores' farm, plus interest that had already accrued, the property was subject to being sold at a tax sale. In that event, unless the government redeemed the property for the purchase price plus eighteen percent interest (in effect, requiring the government to pay interest on interest), a tax sale would divest the government of its mortgage lien on the property.

 The evidence at trial made it apparent that Mr. Gilmore was unwilling to pay the taxes based upon his mistaken belief that the Town would never foreclose on his property. However, there was evidence that the Town advised the government that it was about to institute foreclosure proceedings. We do not resolve that factual dispute because, by the time the government made its post–1989 tax payment, it had declared the loans in default and was seeking to foreclose. Upon foreclosure, the government would have had to pay off the tax liens on which a large amount of interest was accruing in order to have marketable title. Consequently, we find that the government was authorized to pay the taxes and that payment of the delinquent real estate taxes was necessary to protect its lien.

One final issue troubling the Court of Appeals was the Gilmores' argument that the government should have suspended the foreclosure action because they had alleged "discrimination." The evidence at trial revealed that the claimed discrimination was that Mr. Gilmore is white. The FSA gave little weight to this frivolous claim and had long since dismissed the Gilmores' discrimination claim. We find that the discrimination claim was asserted solely for the purpose of delay and had no basis whatsoever. Other similar claims are made by the Gilmores, which we find equally baseless.

*Conclusion*

By failing to make payments under the terms of the loan documents, mortgage and other such agreements, the FSA was entitled to declare the indebtedness due and payable and to foreclose on the Gilmores' property. Consequently, the government is entitled to a judgment of foreclosure, including the costs and expenses of this foreclosure action along with the costs and expenses of a foreclosure sale. The government is directed to submit a proposed judgment with service upon the defendants.